# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **THOMAS E. QUESENBERRY,** | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00116 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,[1]** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Thomas E. Quesenberry, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1]  Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

Case 1:06-cv-00116-PMS   Document 25   Filed 10/10/07   Page 1 of 36   Pageid#: 78

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Quesenberry filed his application for DIB on or about June 25, 2003, (Record, ("R."), at 85-88), alleging disability as of April 14, 2001, due to lower back problems and lumbar disease. (R. at 85, 102.) The claim was denied initially and upon reconsideration. (R. at 32-34, 38, 40-42.) Quesenberry then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 44.) The ALJ held an initial hearing on August 16, 2005, at which Quesenberry was not represented by counsel. (R. at 406-35.) The ALJ kept the matter open, however, and on June 5, 2006, the hearing was reconvened, at which time Quesenberry was represented by counsel. (R. at 436-80.)

By decision dated August 18, 2006, the ALJ denied Quesenberry's claim. (R. at 14-29.) The ALJ found that Quesenberry met the nondisability insured status requirements of the Act for disability purposes through at least the date of the decision. (R. at 27.) The ALJ determined that Quesenberry had not engaged in

substantial gainful activity since the alleged onset of disability. (R. at 27.) The ALJ also found that Quesenberry had medically determinable severe impairments but that Quesenberry's impairments, considered either singly or in combination, did not meet or equal the criteria of any impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) The ALJ found that Quesenberry's allegations regarding his symptoms and complaints of pain were not fully credible. (R. at 28.) In addition, the ALJ determined that since the alleged onset of disability, and through the date of his decision, Quesenberry retained the residual functional capacity to perform light work.[2] (R. at 28.) The ALJ determined that Quesenberry could stand and/or walk for a total of four to six hours, sit for a total of six hours and stand, sit or walk for one hour at a time in a typical eight-hour workday. (R. at 28.) Due to Quesenberry's limitations, the ALJ noted that he must be allowed a sit/stand option. (R. at 28.) Further, the ALJ determined that Quesenberry could occasionally reach, including overhead reaching, climb, balance, kneel, crouch, crawl, stoop and bend. (R. at 28.) Thus, the ALJ found that Quesenberry was unable to perform any of his past relevant work. (R. at 28.) Based on Quesenberry's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ determined there was a significant number of unskilled jobs in the national and regional economies that Quesenberry could perform, including jobs as a parking lot attendant, a nonpostal mail sorter and an office helper. (R. at 27.) Thus, the ALJ

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2007). Furthermore, a job is considered light work when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *See* 20 C.F.R. § 404.1567(b) (2007). If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

found that Quesenberry had not been disabled at any time through at least the date of the ALJ's decision and was not entitled to DIB benefits. (R. at 28-29.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Quesenberry pursued his administrative appeals but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 6-10.) *See* 20 C.F.R. § 404.981 (2007). Thereafter, Quesenberry filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on Quesenberry's Motion For Judgment On The Pleadings filed July 10, 2007, and on the Commissioner's Motion For Summary Judgment filed August 8, 2007.

## II. Facts

Quesenberry was born in 1964, which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c) (2007). (R. at 85.) According to the record, Quesenberry has a 12th-grade education. (R. at 108.) In addition, Quesenberry has past relevant work experience as a dishwasher/dish room assistant supervisor, an automobile mechanic, a maintenance man for a realty company and a maintenance man for a maintenance company. (R. at 103, 114-19.) Quesenberry had an initial hearing on August 16, 2005, at which he was not represented by counsel. (R. at 406-35.) The ALJ kept the matter open, however, and on June 5, 2006, the hearing was reconvened, at which time Quesenberry was represented by counsel. (R. at 436-80.)

At Quesenberry's first hearing before the ALJ on August 16, 2005, he testified that he worked from approximately 1995 to 2001 at Virginia Tech as a dish room supervisor. (R. at 416.) Quesenberry testified that he stopped working at Virginia Tech because of his back. (R. at 416.) At Virginia Tech, Quesenberry lifted items weighing up to 100 pounds. (R. at 417.) Quesenberry also testified that he worked as an automobile mechanic for most of his life and that he worked as a carpenter's helper and a brick mason's helper. (R. at 418.) Quesenberry noted that he worked as an automobile mechanic from 1988 to 1994, and that he worked on brakes, tune-ups, tires, state inspections, transmission work and various other tasks. (R. at 418.) Quesenberry testified that he left his job as an automobile mechanic because of his back pain and immobility. (R. at 418.)

Quesenberry testified that he was hospitalized overnight at Montgomery Regional Hospital, ("MRH"), in February 2005 for stomach problems. (R. at 418-19.) Quesenberry further noted that he was hospitalized in 2004 for pneumonia, and on another occasion in 2004, for addiction problems. (R. at 418.) Quesenberry then stated that he was hospitalized for psychiatric reasons, unrelated to addiction or substance abuse, on one or two different occasions about 10 or 15 years previously. (R. at 419.)

The ALJ next questioned Quesenberry regarding Dr. Ae-Sik Kim's specific limitations, and Quesenberry noted that Dr. Kim informed him not to "lift – what was it – I think she said 10 pounds or was it 40 pounds?" (R. at 420.) He further noted that Dr. Aikin told him that he would "probably be disabled doing any kind – moderate to mild work . . ." and that he could lift items weighing up to 10 pounds. (R. at 420.) Quesenberry stated that he could stand for maybe an hour, and could

walk up to half a mile if necessary. (R. at 421.) Quesenberry further noted that he could sit for about an hour or two before he had to move around, that he could lift a 24-pack of soft drinks, that he had to get on his hands and knees to pick items off the floor, that he could push a grocery cart that was one-half full, could open doors and jars, could dress himself and could climb a flight of stairs. (R. at 421-22.) Quesenberry testified that he did not believe he could perform the job of a security guard that would allow for a sit/stand option, but he was not sure. (R. at 422-23.)

Quesenberry stated that he shared responsibility of taking care of his three-year-old daughter and sometimes did light cooking. (R. at 423.) Quesenberry also stated that if necessary he could sweep, mop, wash clothes and go grocery shopping. (R. at 424.) In response to questioning by the ALJ concerning whether Quesenberry could work a job where he did not have to lift much and where he could move around at will, Quesenberry stated that his pain kept him from working all day. (R. at 427.) Quesenberry testified that he already had undergone one back surgery, and that he was informed by Dr. Weaver that another surgery would not be helpful. (R. at 427.) Quesenberry stated that he did not know how to explain himself and that is why he believed that he needed an attorney. (R. at 427.)

Ann Marie Cash, a vocational expert, also testified at Quesenberry's hearing. (R. at 428-33.) Cash described Quesenberry's past work as a dish washroom supervisor as medium,[3] semi-skilled work, according to the Dictionary of Occupational Titles, ("DOT"). (R. at 430.) Cash noted, however, that

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. *See* 20 C.F.R. § 404.1567(c) (2007). If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

Quesenberry's work as a dish washroom supervisor, would be considered heavy[4] work as described by Quesenberry at the hearing. (R. at 430.) Cash classified Quesenberry's past work as an automobile mechanic as medium, skilled work, according to the DOT. (R. at 430.) Cash testified that Quesenberry possessed no transferable skills from his work as an automobile mechanic. (R. at 430-31.) The ALJ then asked Cash to consider a hypothetical individual of the same, age, education, background and experience as Quesenberry who would be able to perform light work and stand or walk at least two hours, but less than six hours, in a typical eight-hour workday. (R. at 431.) The ALJ asked Cash to assume further that the hypothetical individual would be able to sit for six or more hours in a typical eight-hour workday. (R. at 431.) The ALJ also noted that the hypothetical individual would have some loss of lumbar lordosis and some restriction on the range of motion in the back, but the individual would be able to perform work that required occasional climbing of ramps and stairs. (R. at 431.) The ALJ noted that the hypothetical individual would not be able to perform work that required climbing ladders, ropes or scaffolds, and would be unable to perform work that required more than occasional balancing, kneeling, crouching, crawling, stooping and bending. (R. at 431.) The ALJ also noted that the hypothetical individual would have some limitations in reaching overhead and no limitations on handling, fingering or feeling. (R. at 431.) Lastly, the ALJ pointed out that the individual would have no visual, communicative or environmental limitations. (R. at 431.) Cash testified that such an individual would be able to perform jobs existing in

---

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. *See* 20 C.F.R. § 404.1567(d) (2007). If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2007).

significant numbers in the national economy including those of a receptionist/information clerk at the light and sedentary[5] levels of exertion, a general office clerk, at the light and sedentary levels of exertion and a security worker at the light level of exertion. (R. at 432.)

The ALJ next asked Cash to assume that the state agency residual functional capacity evaluation was accurate and supported by objective medical evidence. (R. at 433.) Cash testified that such an individual would be unable to perform any of Quesenberry's past relevant work. (R. at 433.) The ALJ closed the hearing by noting that the record would remain open for 30 days and a supplemental hearing would be held if Quesenberry obtained a representative. (R. at 434.)

After Quesenberry obtained counsel, a supplemental hearing before the ALJ was held on June 5, 2006. (R. at 436-80.) Quesenberry's counsel moved to strike the record of Quesenberry's August 16, 2005, hearing, and the motion was denied by the ALJ. (R. at 438.)

Quesenberry testified that in May 2005 he was hospitalized because of a pancreatitis attack resulting in no specific limitations. (R. at 447.) He stated that he was subsequently hospitalized for pancreatitis in March, April and May 2006. (R. at 463-64.) Likewise, Quesenberry stated that he had undergone back surgery in the past resulting in no long-term limitations. (R. at 447.) Quesenberry testified, however, that Dr. Kim told him he could not lift items weighing more than 40 pounds and could not stand or sit for long periods. (R. at 447.) The ALJ pointed

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2007).

out that Quesenberry had to sit for at least 35 minutes as he rode to the supplemental hearing and that he had to sit for an hour and a half to ride to the previous hearing. (R. at 447-48.) Quesenberry estimated that he could probably sit for at least an hour, but later testified that he could sit comfortably for only 30 to 40 minutes. He testified that he could stand comfortably for 40 minutes to one hour and walk comfortably for about 20 minutes. (R. 458-59.) Quesenberry also testified that he had seen Dr. Frazier, an orthopedic surgeon, who imposed no limitations. (R. at 448.) Quesenberry testified that he could stand for an hour if necessary, walk 100 yards without feeling pain, walk up to one-half mile if necessary, lift a 24-pack of soft drinks, bend with his knees, squat, push a lawnmower, reach above his shoulders, open jars, dress himself, climb a flight of stairs if necessary and drive a car. (R. at 449-52.) Quesenberry also noted that he could cook if necessary and could take a bath or shower by himself. (R. at 453-55.) Quesenberry opined that he could not perform a job where he had to work for eight hours because of his back pain. (R. at 452-53.)

Quesenberry noted that he had a magnetic resonance image, ("MRI"), performed in March 2006 that showed a herniated disc. (R. at 459-60.) Quesenberry testified that he was restricted from lifting or carring items weighing more than 40 or 50 pounds and from sitting or standing for prolonged periods. (R. at 461.) Quesenberry also stated that he previously had taken Percocet for pain, but that he no longer takes the medication because he ultimately became addicted to it. (R. at 462-63.)

Quesenberry testified that he saw a psychologist in 2004 for drug addiction. (R. at 448.) He noted that during one of his hospital visits, a doctor mentioned that

an antidepressant might benefit him, but he never followed up on the suggestion. (R. at 465-66.) Quesenberry stated that he has been very depressed, was easily frustrated, sometimes threw things, had considered suicide, had trouble socializing and had crying spells at least three or four times a week. (R. at 466-68.) Quesenberry also stated that he had not gone back to visit Dr. Kim because he was ashamed of his previous medication addiction. (R. at 469.) Quesenberry noted that he saw psychologist Teresa Jarrell who did not recommend that he see a psychiatrist or another psychologist. (R. at 470.)

Olen Dodd, a vocational expert, also testified at Smith's supplemental hearing. (R. at 471-79.) Dodd classified Quesenberry's past work as an automobile mechanic as medium, skilled work. (R. at 472.) Dodd classified Quesenberry's work as a dish room supervisor as a kitchen helper as medium, unskilled work. (R. at 472.) Dodd noted that Quesenberry's past work as an automobile mechanic would contain transferable skills, such as mechanical skills, ability to read and understand technical manuals and math aptitude. (R. at 472-73.) The ALJ then asked Dodd to consider a hypothetical individual of the same, age, education, background and experience as Quesenberry who would be able to sit, stand or walk for an hour at a time or for a total of four to six hours in a typical eight-hour workday and who would be able to perform light work. (R. at 473.) The ALJ asked Dodd to assume further that the hypothetical individual could occasionally climb, balance, kneel, crouch, crawl, bend and stoop and would have an unlimited ability to handle and manipulate items, with the exception of some limitation in reaching overhead. (R. at 473.) The ALJ also noted that the hypothetical individual would have no environmental limitations. (R. at 473.)

Dodd testified that such an individual would not be able to perform Quesenberry's past work. (R. at 473.) Dodd testified, however, that there would be jobs available in significant numbers in the national economy that such an individual could perform, including those of a parking lot attendant, a nonpostal mail sorter, an office helper, a night watchman, a merchant patroller, a gate guard, an assembly worker, a repair order clerk and a surveillance system monitor. (R. at 474-75.) Dodd noted although the DOT listed the job of surveillance system monitor as a government job, that information was not accurate today because many private companies now install surveillance systems. (R. at 476.)

Dodd next was asked to consider the same hypothetical individual, but who also was markedly limited in his abilities to understand, remember and carry out detailed or complex instructions, to maintain attention and concentration for extended periods, to perform activities on schedule, maintain regular attendance and be punctual, to perform at a consistent pace, to interact appropriately with the public and with co-workers, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work settings. (R. at 476-77.) Dodd testified that these limitations would not individually preclude many work activities, but that, cumulatively, these limitations might preclude certain jobs. (R. at 477.) Dodd stated that he also would have to consider the positive aspects of the hypothetical individual. (R. at 477.) Quesenberry's counsel then asked Dodd to consider a hypothetical individual with mild limitations on his abilities to remember simple instructions such as locations and work-like procedures, to sustain an ordinary routine without special supervision and to make simple work-related decisions, and a moderate limitation on his ability to work with or near others without being distracted by them. (R. at 477-78.) Dodd

-11-

noted that such an individual would not be able to sustain employment and would have difficulty finding employment. (R. at 479.)

In rendering his decision, the ALJ reviewed records from The Neurosurgical Center of Southwest Virginia; Carilion New River Valley Medical Center; Occupational Medical Services; Dr. Edgar Newman Weaver, M.D.; Dr. Chris Newell, M.D.; Bluefield Mental Health Center; Montgomery Regional Hospital; Carilion Family and Obstetric Medicine, ("CFOM"); Dr. Robert Bowers, M.D.; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. F. Joseph Duckwall, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; R.J. Milan Jr., Ph.D., a state agency psychologist; and Blacksburg Physical Therapy Associates, Inc.

The record shows that Quesenberry presented to Dr. Leslie E. Badillo, M.D., of CFOM, on July 17, 2000, complaining of lower back pain. (R. at 288-289.) Dr. Badillo noted that Quesenberry had chronic back pain, stating that he incurred a back fracture while playing football and had previously undergone back surgery due to a herniated disc. (R. at 288.) Quesenberry noted that he could not stop working because he needed the money, but that his back pain worsened when he walked continually on concrete. (R. at 288.) Dr. Badillo noted that Quesenberry had good posterior flexion, good lateral flexion, good deep tendon reflexes and that his anterior flexion was a little uncomfortable. (R. at 288.) Dr. Badillo prescribed Flexeril and Lorcet and cautioned Quesenberry on overuse of his medication. (R. at 289.)

Quesenberry presented to Dr. Kent R. Aikin, M.D., of CFOM, on October 31, 2000, for a follow-up from an emergency room, ("ER"), visit the previous day regarding a rib fracture suffered while playing football. (R. at 276.) Dr. Aikin noted that the ER physician diagnosed Quesenberry with a fracture of the right fourth rib, and that a chest x-ray suggested a possible mass in the area surrounding his left mid lung. (R. at 276.) Dr. Aikin's chest exam revealed no bruising or swelling, but tenderness over the lateral right fourth rib was noted. (R. at 276.) Dr. Aikin also noted that Quesenberry's rib and chest x-rays revealed a small nodule in the area surrounding his left mid lung as well as an essentially nondisplaced right fourth rib fracture. (R. at 276.) For treatment, Dr. Aikin suggested a rib belt, scheduled a computerized tomography, ("CT"), scan and prescribed Lorcet-HD for pain. (R. at 277.) CFOM's records also contain an imaging report from October 30, 2000, noting an acute nondisplaced fracture of the anterolateral right fourth rib and minimal pleural fluid. (R. at 278.)

On November 10, 2000, Quesenberry had a follow-up visit regarding his rib pain. (R. at 274-75.) Dr. Aikin noted gradual improvement in Quesenberry's pain and a mildly tender right chest wall. (R. at 274.) Dr. Aikin instructed Quesenberry to contact him after a scheduled CT scan and otherwise continued Quesenberry on his then-current treatment. (R. at 274.) Quesenberry's CT scan was performed on November 14, 2000, revealing several pulmonary nodules, some of which were calcified and all of which were most likely granulomata. (R. 272.) On November 28, 2000, Quesenberry presented to Dr. Aikin for treatment regarding a hunting fall and for a follow-up on his rib pain. (R. at 269-70.) Quesenberry noted that he slipped while hunting and fell on his back, re-injuring his rib. (R. at 269.) Quesenberry reported increased discomfort and tenderness in the area surrounding

-13-

his right ribs. (R. at 269.) Dr. Aikin noted that his office helped Quesenberry locate a rib belt and continued Quesenberry on symptomatic treatment. (R. at 270.)

On February 2, 2001, Quesenberry stated that he had nonradiating pain in his lower back and that he felt "tight and sore." (R. at 259.) An exam of Quesenberry's lower back revealed tenderness along the right paralumbar soft tissues, while his deep tendon reflexes were +2 patellar bilateral, +1 right Achilles and +2 left Achilles. (R. at 259.) Dr. Aikin diagnosed low right paralumbar soft tissue strain. (R. at 259.) He ordered Quesenberry to be off work for the day and continued him on his then-current medications and symptomatic treatment. (R. at 259.) On February 14, 2001, Quesenberry noted quite a bit of pain across both sides of his lower back, presacral area and buttocks and limited flexion and extension due to discomfort. (R. at 254.) Dr. Aikin reported that Quesenberry appeared mildly uncomfortable and had tenderness in his back's soft tissue region, but that he had good strength in his legs and a normal gait. (R. at 254.) Quesenberry was diagnosed with low back strain. (R. at 254.) Dr. Aikin recommended physical therapy. (R. at 254.)

Quesenberry was evaluated by Rony Masri, M.P.T., A.T.C., of Blacksburg Physical Therapy Associates, Inc., on February 15, 2001. (R. at 252-53.) Masri noted that Quesenberry complained of intermittent back pain for the previous 10 to 15 years, stemming from a high school football injury. (R. at 252.) Quesenberry reported his most recent exacerbation to be four or five months prior to his visit with Masri, and he described his pain as a five or six on a ten-point scale. (R. at 252.) Quesenberry described the pain as an intermittent dull, achy pain that worsened with sitting, bending and standing. (R. at 252.) He denied numbness and

-14-

tingling in his lower extremities, and noted that he had previous success with physical therapy. (R. at 252.) Masri found that Quesenberry had a slow, guarded gait and a slouched, forward head posture. (R. at 252.) Quesenberry's lumbar lordosis and left lumbosacral shift was reduced when standing, and myotomal and dermatomal scans were clear. (R. at 252.) Masri also noted intact reflexes and sensation bilaterally in the lower extremities, a negative slump sitting test, negative straight leg raise tests and complaints of pulling in the low back region. (R. at 252.) Masri described Quesenberry's lumbar range of motion as follows: flexion to the mid-thigh with complaints of increased low back pain, extension 50 percent limited with reports of relief in pain and side bending two inches from the distal knee crease with no increase in symptoms. (R. at 252.) Masri noted that Quesenberry was able to ambulate on his heels and toes without reports of pain or difficulty, and that palpation revealed tenderness throughout the lumbosacral area. (R. at 252.) Masri discussed immediate and long-term goals, including correction of Quesenberry's lumbosacral shift, posture training, moist heat and electrical simulation for symptomatic relief and the initiation of a home exercise program. (R. at 252-53.)

On February 23, 2001, Quesenberry reported no significant overall improvement in his back pain, but also reported increased back pain when standing. (R. at 249.) Dr. Aikin diagnosed low back strain. (R. at 249.) Dr. Aikin noted that Quesenberry needed a neurosurgical evaluation, referred Quesenberry to Dr. Edgar N. Weaver, M.D., a board certified neurosurgeon, and directed Quesenberry to remain off work. (R. at 221, 248-50.) On March 1, 2001, Dr. Aikin ordered Quesenberry's physical therapy to continue for four more weeks. (R. at 244.) On March 12, 2001, Quesenberry called Dr. Aikin and requested an order for

more time off work, and Dr. Aikin extended his time off work until March 19, 2001. (R. at 242.)

In addition, on March 12, 2001, Quesenberry presented to Dr. Edgar N. Weaver Jr., M.D., a neurosurgeon. (R. at 142.) Dr. Weaver noted that Quesenberry had undergone a simple decompressive procedure at the L5-6 level of the spine, and that he had spondylolysis at that level. (R. at 142.) On examination by Dr. Weaver, Quesenberry had some tenderness at the lumbosacral junction and some diminution of right angle jerk. (R. at 142.) Dr. Weaver recommended that Quesenberry return to work the next day, and if Quesenberry was unable to work, Dr. Weaver recommended that he undergo a formal functional capacity evaluation. (R. at 142.) Dr. Weaver opined that Quesenberry was not a surgical candidate. (R. at 142.)

On March 20, 2001, Quesenberry presented to Dr. Aikin, complaining of back pain that disturbed his sleep and caused him to feel fatigued and frustrated. (R. at 222.) Quesenberry noted that he did not feel he could perform his job adequately, and he did not feel like he could attend physical therapy. (R. at 222.) Dr. Aikin diagnosed a low back strain with persistent pain and depression that was secondary to his back pain. (R. at 222-23.) Dr. Aikin started Quesenberry on amitriptyline for sleep, ordered him off work until March 26, 2001, and directed Quesenberry to return to physical therapy. (R. at 223.)

On March 26, 2001, Dr. Aikin diagnosed Quesenberry with acute viral gastroenteritis, possible alcohol-induced gastritis and low back strain. (R. at 220.) Dr. Aikin increased Quesenberry's amitriptyline dosage and ordered him off work

-16-

until April 3, 2001. (R. at 217-20.) Quesenberry returned to Dr. Aikin's office the next day, March 27, 2001, and was given an injection of Nubain and Phenergan for his continued stomach problems. (R. at 215-16.) An imaging report dated March 28, 2001, of an abdominal x-ray revealed that Quesenberry's intestinal gas pattern, soft tissues and bones appeared normal. (R. at 213.)

Quesenberry presented to Dr. Aikin for a back pain follow-up on April 2, 2001. (R. at 211-12.) Quesenberry reported that he was sleeping better because of the amitriptyline, had no new back-related symptoms and was eating normally, with no nausea, vomiting or other stomach problems. (R. at 211-12.) Dr. Aikin diagnosed Quesenberry with a lumbar strain, underlying chronic degenerative disc disease and degenerative joint disease, but he noted that Quesenberry had "certainly reached a level of improvement that would allow a trial of work." (R. at 212.) Quesenberry returned to work on April 3, 2001, but called Dr. Aikin's office on April 10, 2001, to inform Dr. Aikin that he could work only two and one-half days during the week of April 3 and would like a functional capacity evaluation to be performed. (R. at 209-10.) On April 10, 2001, Dr. Aikin wrote a letter to Quesenberry's then-current employer, noting that Quesenberry was disabled from his present occupation and that he had advised Quesenberry to remain off work and to continue treatment for his back. (R. at 207.) Dr. Aikin anticipated that Quesenberry's condition would result in a permanent disability for moderate to heavy work. (R. at 207.)

On May 22, 2001, Dr. Aikin reported that Quesenberry's back pain was moderate and radiated down to his legs. (R. at 197.) Dr. Aikin noted that Quesenberry continued to guard movement of his back, but that he ambulated

normally. (R. at 197.) Quesenberry also complained of emotional distress due to concern over his health problems and financial matters. (R. at 197.) Dr. Aikin diagnosed depressive disorder with anxiety and chronic low back pain. (R. at 198.) Dr. Aikin prescribed Paxil for depression, and he recommended that Quesenberry see Dr. Wilson for a rehabilitation evaluation. (R. at 198.) On June 20, 2001, Dr. Aikin sent Dr. Wilson a letter asking him to suggest a new avenue of treatment for Quesenberry's pain. (R. at 194.) Dr. Aikin noted that Dr. Weaver did not feel that Quesenberry had a surgical problem, and that Quesenberry had failed to respond adequately to medication and physical therapy. (R. at 194.) Dr. Aikin also wrote that Quesenberry appeared to be genuinely motivated to get back to some type of employment. (R. at 194.)

Quesenberry visited the ER on July 16, 2001, complaining of lower back pain. (R. at 144, 189.) A physical examination by the ER physician revealed pain and tightness primarily in the sacroiliac joints bilaterally and down through his paraspinous muscles bilaterally. (R. at 144, 189.) The ER physician gave Quesenberry an injection of Toradol, instructed him to use ice packs and prescribed Voltaren. (R. at 144, 189.)

On July 18, 2001, Quesenberry sought treatment at CFOM to follow up on his back pain. (R. at 187.) Quesenberry informed Dr. Aikin that he would like to stop taking Percocet, and that he did feel that Paxil was helping to level out his moods. (R. at 187.) Dr. Aikin diagnosed Quesenberry with low back pain and directed Quesenberry to resume taking Paxil and to take one-half of a Percocet along with Ultram and Celebrex for pain. (R. at 187.)

-18-

After being referred by Dr. Aikin, Quesenberry presented to Dr. Richard L. Wilson Jr., M.D., on August 1, 2001, complaining of low back pain and bilateral knee pain. (R. at 151.) On physical examination, Dr. Wilson found that Quesenberry had full range of motion of the lumbar spine, no real pain on direct palpation, normal strength, normal sensation, normal reflexes, no ligamentous laxities or other reproducible pains in the knee and some scattered mild arthritic changes. (R. at 151.) Dr. Wilson noted that x-rays of the lumbar spine and knees were essentially unremarkable. (R. at 151.) Dr. Wilson started Quesenberry on Voltaren, Neurontin and Ultram in an attempt to keep Quesenberry off opiates. (R. at 151.)

Quesenberry presented to Dr. Wilson for follow-ups on his back pain on August 29, September 5 and September 12, 2001. (R. at 148-50.) On August 2, Quesenberry informed Dr. Wilson that he was not tolerating Voltaren, but that Ultram helped with his knee pain. (R. at 150.) After reviewing a pain medication agreement with Quesenberry, Dr. Wilson started Quesenberry on methadone and noted that Quesenberry did have the functional capacities to perform the majority of job duties, particularly if they were in the sedentary or light work categories. (R. at 150.) On September 5, 2001, Dr. Wilson increased Quesenberry's dosage of Methadone and noted that Quesenberry was observed ambulating normally. (R. at 149.) Dr. Weaver continued Quesenberry's medication regime on September 12, 2001, and scheduled him for monthly visits after noting that Quesenberry's complaints of pain were subjective and Quesenberry appeared to be active and doing well. (R. at 148.)

Quesenberry presented to Dr. Aikin on October 23, 2001, for a follow-up to a hospital visit on October 14, 2001. (R. at 183.) Dr. Aikin's records indicate that Quesenberry fell off of a ladder on October 11, 2001, and went to the ER three days later after continued shortness of breath and discomfort. (R. at 183.) Quesenberry was admitted to the hospital and was under a hospital physician's care for two days. (R. at 183.) Quesenberry noted that he was no longer under Dr. Wilson's care, however, because Dr. Wilson was unable to help with his symptoms. (R. at 184.) Dr. Aikin noted that Quesenberry's lungs were clear and that his chest wall was somewhat tender on the right side. (R. at 184.) Quesenberry was advised to quit smoking and to continue symptomatic treatment for his back and rib pain. (R. at 184.)

Quesenberry presented to Dr. Aikin on December 17, 2001, for an evaluation of a twisted left knee after he slipped in his kitchen and struck the anterior aspect of his left knee. (R. at 239.) Dr. Aikin noted an abrasion across the prepateller aspect of the left knee, guarded movement, excellent strength and stability in the joint, diffuse tenderness and slight swelling. (R. at 239.) An x-ray of Quesenberry's left knee did not reveal any evident bony abnormality. (R. at 239.) Dr. Aikin diagnosed a contusion and probable mild strain of the left knee, and he ordered Quesenberry to use crutches and ice several times a day, followed by heat for several days. (R. at 240.)

On January 9, 2002, Quesenberry presented to Dr. Thomas C. Mogen, M.D., of CFOM, complaining of pain as a result of falling on ice. (R. at 235-36.) Quesenberry reported having abrasions and pain around his shoulder and right lateral ribs as a result of the fall. (R. at 235.) Dr. Mogen's physical exam revealed

-20-

no other significant abnormalities except tenderness over his right lateral rib area accompanied by abrasions on his right side. (R. at 236.) Dr. Mogen diagnosed minor chest pain and a contusion to Quesenberry's chest wall, prescribed Lodine and Tylenol #3 and instructed Quesenberry to rest and apply heat to the pain. (R. at 236.)

On January 18, 2002, Quesenberry complained of cough and sinus congestion accompanied by right lateral upper chest and lateral and upper right back pain. (R. at 232-33.) Dr. Mogen's physical exam revealed tenderness in Quesenberry's right lateral ribs, which extended to Quesenberry's back and right shoulder blade region. (R. at 233.) Dr. Mogen diagnosed minor chest pain and prescribed Percocet and Skelaxin for relief. (R. at 233.) Dr. Mogen also scheduled physical therapy for Quesenberry, ordered rib x-rays and directed him to start a walking program. (R. at 233.)

Quesenberry had a left knee x-ray at Carilion Health Systems on January 22, 2002. (R. at 231.) The imaging report revealed no evidence of fracture or dislocation; however, there was a small focus of sclerosis involving the posterior cortex of the distal femoral diaphysis/metaphysis. (R. at 231.) On January 29, 2002, Quesenberry called CFOM requesting medication for depression and was prescribed Paxil by Dr. Aikin. (R. at 230.) On November 16, 2002, Quesenberry had right rib x-rays taken at Carilion New River Valley Medical Center. (R. at 146.) The x-rays revealed no rib abnormalities and widening of the upper mediastinum. (R. at 146.) Radiologist, Dr. Donna L. Aubrey, M.D., recommended a CT scan for further evaluation. (R. at 146.)

Quesenberry was seen at the ER for abdominal pain on May 13, 2003. (R. at 175.) The ER physician determined that Quesenberry "probably [had] a small ventral hernia." (R. at 175.) The ER physician ordered a CT scan and prescribed Vicodin for pain. (R. at 175.) CFOM's records show that Quesenberry underwent a CT scan of his pelvis and abdomen on May 14, 2003, which revealed several small right middle lobe nodules and a small left lower lobe nodule, all completely characterized. (R. at 293.) A tiny right anteriorpericardiophrenic lymph node was noted along with minimal bilateral pleural thickening. (R. at 293.) The CT scan also revealed no definite evidence of acute intra-abdominal or pelvic inflammatory process, no free fluid, no free air, no abscess, no stones or hydronephrosis and no evidence of obstruction. (R. at 293.)

On May 15, 2003, Quesenberry's hernia was reduced, and a ventral herniorrhaphy was performed. (R. at 165-67.) Quesenberry tolerated the procedure well and left the operating room in satisfactory condition. (R. at 167.) Quesenberry presented to Dr. Robert M. Bowers, M.D., of CFOM, for a follow-up regarding his ventral hernia repair on May 20, 2003, and May 28, 2003. (R. at 160, 164.) On May 20, Dr. Bowers noted that Quesenberry was having some discomfort, but was doing well overall. (R. at 164.) On May 28, Dr. Bowers indicated that Quesenberry was feeling well with no complaints. (R. at 160.) At both visits, Dr. Bowers instructed Quesenberry not to do any heavy lifting. (R. at 160, 164.)

Quesenberry presented to Dr. Ae-Sik Kim, M.D., on May 29, June 26 and July 24, 2003, for referral visits regarding his back pain.[6] (R. at 153-54, 159.) Dr. Kim reported that Quesenberry had pain in the middle of his back, extending into

[6] Dr. Kim's records are mostly illegible.

-22-

his right hip and down the back of his leg. (R. at 159.) Quesenberry indicated that the pain had become worse over the previous three weeks and that pain pills helped a little. (R. at 159.) Quesenberry also indicated increased hernia pain. (R. at 159.) On June 26, 2003, Dr. Kim noted that Quesenberry continued to have lower back pain and that he was experiencing anxiety and depression. (R. at 154.) On July 24, 2003, Dr. Kim noted that Quesenberry had "stabbing and aching" back pain that affected his hips and legs. (R. at 153.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed a physical residual functional capacity assessment on September 2, 2003. (R. at 294-99.) Dr. Hartman found that Quesenberry was able to occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk for a total of six hours in a typical eight-hour workday, sit for a total of six hours in a typical eight-hour workday and push and/or pull an unlimited amount of time during a typical eight-hour workday. (R. at 295.) Dr. Hartman imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 296-97.) Dr. Hartman found Quesenberry's statements regarding his symptoms to be partially credible. (R. at 300.) Dr. F. Joseph Duckwall, M.D., another state agency physician, reviewed Dr. Hartman's report and affirmed his findings on November 26, 2003. (R. at 299.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on September 2, 2003. (R. at 301-13.) Leizer's assessment revealed a nonsevere impairment, namely depression. (R. at 301, 304.) Leizer reported that Quesenberry had no limitation on his ability to maintain social functioning, no difficulty in maintaining concentration, persistence and pace and

no repeated episodes of decompensation. (R. at 311.) Leizer reported that there was insufficient evidence to determine whether Quesenberry had any restrictions on his activities of daily living. (R. at 311.) Leizer noted that Quesenberry's mental impairments were not severe, and his allegations were not considered credible. (R. at 313.) R.J. Milan Jr., Ph.D., another state agency psychologist, reviewed Leizer's report and affirmed his findings on November 25, 2003. (R. at 301.)

On May 4, 2004, Quesenberry was admitted as a walk-in patient to Carilion Saint Albans Behavioral Health Unit, ("Saint Albans"), for treatment of opiate abuse and depression. (R. at 344-54.) Quesenberry was treated by Dr. Hal G. Gillespie, M.D., and was diagnosed with recurrent and severe, recurrent major depression and opiate dependence and abuse. (R. at 345.) Quesenberry's medication was slowly reduced throughout eight days of treatment, and multiple medications were provided for his depression and anxiety related to his withdrawal symptoms. (R. at 344-54.) At discharge, Dr. Gillespie noted that Quesenberry denied suicidal ideation, continued to complain of nonmanageable severe back pain and continued to have significant depression and anxiety. (R. at 345.) Quesenberry was released with instructions on how to control his use of pain medicine, and he was prescribed enough Percocet to last him until his next appointment with Dr. Kim. (R. at 345.)

Quesenberry presented to Dr. Aikin on June 2, 2004, complaining of continued symptoms from a previous bout with pneumonia. (R. at 377.) Dr. Aikin informed Quesenberry that many of his symptoms could be the result of Percocet withdrawal and instructed him to contact the psychiatry service at Saint Albans if necessary. (R. at 378.) Dr. Aikin did not feel it was appropriate to prescribe

Quesenberry any more narcotic medication, including cough medicine, and instead, prescribed Tessalon Perles for Quesenberry's cough. (R. at 377.)

Dr. Chris Newell, M.D., completed a medical consultant report for Quesenberry on March 17, 2005. (R. at 315.) Dr. Newell determined that Quesenberry could stand or walk at least two hours in a typical eight-hour workday, sit about six hours in a typical eight-hour workday, lift and/or carry items weighing up to 10 pounds frequently and items weighing up to 20 pounds occasionally, bend, stoop and crawl occasionally and reach, handle, feel, grasp and finger frequently. (R. at 318-19.) Dr. Newell imposed no visual or communicative limitations. (R. at 319.)

Upon referral of legal counsel, Quesenberry presented to Teresa E. Jarrell, M.A., a licensed psychologist, on October 6, 2005. (R. at 325-42.) Jarrell completed a psychological evaluation on October 6, 2005, and a mental assessment on October 22, 2005. (R. at 325-42.) Jarrell found that Quesenberry had mild limitations on his ability to remember locations and work-like procedures, to understand, remember, and carry out short, simple instructions, to sustain an ordinary routine without special supervision and to make simple work-related decisions. (R. at 325.) Jarrell also found that Quesenberry had a moderate limitation on his ability to work with or near others without being distracted by them. (R. at 325.) Jarrell also found that Quesenberry had marked limitations on his ability to understand, remember and carry out detailed or complex instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual, to complete a normal workday or workweek, to perform at a consistent pace, to interact

-25-

appropriately with the public, supervisors and co-workers and to respond appropriately to work pressures and changes in a normal or routine work setting. (R. at 325-26.) In addition, Jarrell noted that Quesenberry's abilities to apply mathematical skills, to spell and to express thoughts were significantly below average, while his alertness to attention and detail was hindered by pain. (R. at 326.) Jarrell determined that Quesenberry's mental impairments would cause him to be absent from work about three times a month. (R. at 327.) Jarrell assessed Quesenberry's Global Assessment of Functioning, ("GAF"), score to be 50.[7] (R. at 341.) Jarrell concluded that Quesenberry did not appear capable of sustained, competitive, gainful employment and that his prognosis was poor. (R. at 341-42.)

Quesenberry presented to Dr. Reed R. Lambert, M.D., of CFOM, on March 2, 2006, complaining of chronic back pain and weakness. (R. at 393-94.) Dr. Lambert noted that Quesenberry had right radicular problems, 3/5 extensor weakness and that he could not stand on his toes due to his right foot weakness. (R. at 393.) Dr. Lambert prescribed Ultram and Naprosyn for Quesenberry's back pain and recommended an MRI. (R. at 394.)

Quesenberry was admitted to MRH on March 12, 2006. (R. at 355-56.) While at MRH, Quesenberry was treated for abdominal pain due to acute pancreatitis. (R. at 356.) Quesenberry was discharged on March 16, 2006. (R. at 356.) He also was admitted to MRH on April 13, 2006, for pancreatitis and

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 41-50 indicates "serious symptoms . . . OR any serious impairment in social, occupational or school functioning." DSM-IV at 32.

Case 1:06-cv-00116-PMS   Document 25   Filed 10/10/07   Page 26 of 36   Pageid#: 103

dyslipidemia and was discharged on April 18, 2006. (R. at 360-61.) After an ER visit on May 2, 2006, for abdominal pain and vomiting, Quesenberry was admitted to MRH a third time on May 3, 2006, for pancreatitis and irritable bowel syndrome. (R. at 357-58, 366-67.) He was discharged on May 8, 2006. (R. at 358.) Quesenberry also was seen at MRH's ER on May 20, 2006, for dental pain. (R. at 373-76.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. If the claimant is able to establish a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A) (West 2003 &

-27-

Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 18, 2006, the ALJ denied Quesenberry's claim. (R. at 14-29.) The ALJ found that Quesenberry had medically determinable severe impairments, but that Quesenberry's impairments, considered either singly or in combination, did not meet or equal the criteria of any impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) In addition, the ALJ determined that since the alleged onset of disability, and through the date of his decision, Quesenberry retained the residual functional capacity to perform light work with a sit/stand option and occasional abilities to reach, including overhead reaching, to climb, to balance, to kneel, to crouch, to crawl, to stoop and to bend. (R. at 28.) Thus, the ALJ determined that Quesenberry was unable to perform any of his past relevant work. (R. at 28.) Based on Quesenberry's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ determined there were a significant number of unskilled jobs in the national and regional economies that Quesenberry could perform, including jobs as a parking lot attendant, a nonpostal mail sorter and an office helper. (R. at 27-28.) Thus, the ALJ found that Quesenberry was not disabled at any time through at least the date of the ALJ's decision. (R. at 28-29.) *See* 20 C.F.R. § 404.1520(g) (2007).

Quesenberry argues that the ALJ's decision was not supported by substantial evidence. (Brief In Support Of Motion For Judgment On The Pleadings, ("Plaintiff's Brief"), at 2-9.) In particular, Quesenberry first argues that the ALJ erred by not allowing him to be represented by counsel at his first hearing.

(Plaintiff's Brief at 4-5.) Second, Quesenberry argues that the ALJ failed to identify his severe impairment(s). (Plaintiff's Brief at 5.) Third, Quesenberry argues that the ALJ disregarded expert evidence concerning his mental limitations and, instead, relied on his own personal opinion regarding those limitations, excluding certain mental limitations from his hypothetical question to the vocational expert. (Plaintiff's Brief at 6-8.) Fourth, Quesenberry argues that the ALJ erred by failing to consider Dr. Newell's opinion that Quesenberry would need to be absent from work two or more days a month. (Plaintiff's Brief at 8.) Fifth, Quesenberry argues that the ALJ's determination of Quesenberry his residual functional capacity is not supported by the record and is based solely on his own opinion. (Plaintiff's Brief at 8-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, if his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Quesenberry's first argument is that the ALJ erred by not allowing him to be represented by counsel at his first hearing.[8]  (Plaintiff's Brief at 4-5.) I disagree. While, it is well-settled that claimants in disability cases are entitled to a full and

_____

[8] Exhibit A to Plaintiff's Brief is a form completed by Quesenberry, noting that he did not wish to proceed without an attorney or non-attorney representative.

fair hearing of their claims, and the failure to have such a hearing may constitute good cause sufficient to remand to the Commissioner under 42 U.S.C. § 405(g), the "lack of representation by counsel is not by itself an indication that a hearing was not full and fair …." *Sims v. Harris*, 631 F.2d 26, 27-28 (4th Cir. 1980). The absence of counsel at Quesenberry's first hearing did not create clear prejudice or unfairness to Quesenberry and thus, remand is not proper on this basis. *See Dombrowolsky v. Califano*, 606 F.2d 403 (3rd Cir. 1979); *Cross v. Finch*, 427 F.2d 406 (5th Cir. 1970).

Quesenberry offers no evidence that his record was not fully developed. To the contrary, the ALJ provided Quesenberry with the opportunity to obtain a representative, supplement the record and obtain a supplemental hearing. Quesenberry did, in fact, obtain a representative, supplement the record and attend a supplemental hearing. There is no evidence to suggest that the ALJ did not adequately develop the record after two hearings, two examinations of two different ocational experts and the ability of Quesenberry's counsel to examine both Quesenberry and the vocational expert upon which the ALJ relied. (R. at 27.) Moreover, Quesenberry has failed to offer any harmful or incorrect evidence from the first administrative hearing that was unable to be clarified at the second hearing. For these reasons, I find that the ALJ did not err in this regard.

Quesenberry's second argument is that the ALJ failed to identify his severe impairment(s). (Plaintiff's Brief at 5.) Particularly, in his brief, Quesenberry asks, "[h]ow can a reviewing court possibly determine whether an impairment(s) was properly evaluated if one does not know what the impairment is or the Listing to which it was compared?" (Plaintiff's Brief at 6.) Quesenberry's brief, however,

fails to suggest any listed impairment that the ALJ should have considered. Further, Quesenberry fails to cite any case law, statute, regulation or significant reason indicating why the ALJ should mechanically state that each physical symptom discussed was compared to any possible applicable listing. Quesenberry's argument is analogous to the following argument made in *Russell v. Chater*, No. 94-2371, 1995 WL 417576, *3-4 (4th Cir. July 7, 1995):

> [Russell's counsel] maintains that the ALJ should have undertaken a detailed comparison of Russell's symptoms with each of the listed impairments set forth in the applicable regulations. Absent such an examination, Russell contends, judicial review is impossible.

> We disagree. In *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), we remanded for further explanation because the ALJ failed to explain his conclusion that the claimant's disabilities were not equivalent to any listed impairment. We explained: The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination. *Cook*, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases. Here, the need for a full explanation is questionable at best because Russell does not take issue with the *substance* of the ALJ's step-three analysis; notably absent from his briefs on appeal is any meaningful contention that the ALJ's step-three determination is unsupported by substantial evidence. Moreover, this case is factually distinguishable from *Cook*. There, a number of listed conditions were potentially applicable, but we could not sort through the possibilities because of the ALJ's cursory and internally inconsistent findings; here, the ALJ discussed the evidence in detail and amply explained the reasoning which supported his determination. There is thus no impediment to judicial review in the case before us. (citations omitted)

Likewise, in this case, Quesenberry's brief lacks any meaningful contention that the ALJ's step-three determination is unsupported by substantial evidence. Further, the ALJ's opinion does not contain cursory or internally consistent findings. The ALJ discussed the pertinent medical evidence in detail and amply explained the reasoning which supported his determination. *See Huntington v. Apfel,* 101 F. Supp.2d 384, 391 n.7 (D. Md. 2000); *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 646-47 (D. Md. 1999). Thus, the record below is adequate and there is no impediment to judicial review of this case.

Quesenberry's third argument is that the ALJ impermissibly disregarded psychologist Teresa Jarrell's expert evidence concerning Quesenberry's mental limitations. (Plaintiff's Brief at 6-8.) As a result, Quesenberry argues that the ALJ failed to include all of Quesenberry's mental limitations in his hypothetical question to the vocational expert. Insofar as Quesenberry argues substantial evidence does not exist in the record to support the ALJ's determination of his mental impairments, I disagree. As a result, the ALJ's hypothetical question is not required to include mental impairments that the ALJ rejects. It is clear in the ALJ's opinion that he rejected Jarrell's assessment because it conflicted with substantial evidence in the record. (R. at 20-24.) It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ

may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Here, conflicting psychiatric and psychological evidence exists in the record. In this case, the evidence shows that Quesenberry's mental limitations, aside from sporadic bouts of depression, appear only in Teresa Jarrell's report, which was made after only one visit with Quesenberry. (R. at 20.) None of Quesenberry's treating physicians referred him to a mental health professional, and he sought treatment from Jarrell only after being referred by his attorney. (R. at 20.) As the ALJ notes:

> The severe and debilitating symptoms which psychologist Jarrell concludes the claimant experiences do not appear in any of his other medical records during the prior four years; symptoms that one must assume would have raised the concern of his physicians and the need for immediate treatment. The claimant did not report these debilitating [signs/symptoms] to his physicians, only stating on one occasion that he had some recurrent depression and wanted to restart Paxil. Psychologist Jarrell did not see the claimant prior to October 2005, and has not seen or treated him since that time. The record does not document that any of his treating physicians believed his mental health warranted referral to a psychologist or psychiatrist.

(R. at 20-21.)

The ALJ also noted, "[a] longitudinal review of the medical records does not document any symptoms reflecting any significant functional restriction from the claimant's mental impairment(s)." (R. at 23.) Further, he stated, "other than the

claimant's self reporting to psychologist Jarrell, his well documented medical record is absent any corroboration" for Jarrell's opinion. (R. at 23.) Accordingly, where substantial evidence exists to support the ALJ's determination, and the ALJ has set forth his findings, this court may not upset the ALJ's decision. Therefore, I reject Quesenberry's argument on this issue and find that substantial evidence supports the rejection of Jarrell's opinion.

Quesenberry's fourth argument is that the ALJ erred by failing to consider Dr. Newell's opinion that Quesenberry would need to be absent from work two or more days a month. (Plaintiff's Brief at 8.) As previously noted, an ALJ has a duty to weigh the evidence in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. The ALJ, therefore, has a duty to indicate explicitly that he has weighed all relevant evidence, indicate the weight given to this evidence and sufficiently explain his rationale in crediting the evidence. *See Stawls*, 596 F.2d at 1213. As a result, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. *See Hays*, 907 F.2d at 1456.

As the ALJ noted, the "record does not support the opinion that the claimant would be absent from work two or more days per month," and Quesenberry's "treatment history does not support a conclusion that he would be absent from work two or more days per month." (R. at 26.) Dr. Wilson opined that Quesenberry had "the functional capacities to perform the majority of job duties, particularly if they were in the sedentary or light duty category." (R. at 150.) Similarly, Dr. Aikin limited Quesenberry only from the performance of moderate to heavy manual

work. (R. at 207.) Further, both state agency physicians determined that Quesenberry had the ability to perform medium work. (R. at 300.)

Thus, the ALJ did not err in limiting the weight he assigned to Dr. Newell's opinion because it conflicted with other evidence in the record. *See* 20 C.F.R. § 404.1527 (2007). The "ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence," *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[9] Substantial evidence exists in the record to support the ALJ's findings and Quesenberry's argument is without merit. *See Hays*, 907 F.2d at 1456.

Quesenberry's fifth argument is that the ALJ's determination of Quesenberry's residual functional capacity is not supported by the record and is based solely on opinion. (Plaintiff's Brief at 8-9.) Specifically, concerning the ALJ's determination of Quesenberry's residual functional capacity, Quesenberry states, "[by] identifying no source, one must form the obvious conclusion that it is [the ALJ's] personal opinion." (Plaintiff's Brief at 9.) Again, Quesenberry's argument is supported by no legal analysis and lacks merit. Contrary to Quesenberry's assertion, the ALJ has the final responsibility for assessing a

---

[9] Hunter was superseded by 20 C.F.R. § 404.1527(d)(2), which states in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2) (2007).

claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2007). The undersigned finds that the ALJ analyzed all the relevant evidence and sufficiently explained his rationale in determining Quesenberry's residual functional capacity. As such, the ALJ's determination of Quesenberry's residual functional capacity is supported by substantial evidence in the record.

## *IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Quesenberry's motion for judgment on the pleadings. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:  This 10th day of October 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE